Anthony Norville, Plaintiff-Appellee, v. Lawrence Dambacher et al., Defendants. Lawrence Dambacher and Lillian Schneider, Defendants-Appellants.

Gen. No. 10,392.

Third District.

May 16, 1962.

Hershey & Bliss (John A. Slevin, Richard G. Hershey, of counsel), all of Taylorville, for appellant.

Coale, Johnston, Flesher & Taylor, Daniel G. Reese (John W. Coale, D. W. Johnston, Daniel G. Reese, of counsel), all of Taylorville, for appellee.

REYNOLDS, J.

This is a suit by the plaintiff for a declaratory judgment as to his rights in and to certain farms in Christian County, Illinois. Defendant Dambacher claimed to be the rightful tenant and defendant Schneider the owner.

Anthony Norville had farmed the farms in question under James Collins. Collins died March 7, 1958, and afterwards Norville entered into a written lease with Mildred Eby, executrix of the Will of James Collins, leasing the farms for a term ending March 1st, 1959. The two farms are identified as the Sicily tract of 120 acres and the Jeiseyville tract of 160 acres. Approximately 30 acres of pasture land and buildings of the two tracts were not leased to Norville for 1958–59. After March 1, 1959, Norville stayed on as tenant of the two farms, excepting the pasture lands, for the year ending March 1, 1960. The ownership of the farms from the death of Collins to February 1960, was vested in Mildred Eby, Stuart Traynor and Alice Lightbody as trustees under the will of James Collins. In February 1960, Joe Simpkins and Dr. Berman of St. Louis purchased the lands in the name of one Lillian Schneider, who worked in the

213

office of Simpkins. Sometime in February or March of 1960, Glenwood Mason told Norville he had been appointed overseer of the farms and Mason at that time told Norville that he could go ahead and farm the lands for the farm year ending March 1, 1961. At that time an agreement was made by the two for Norville to also rent the pasture lands and buildings for the year, Norville to pay $200 cash rent and to do some work on the house. About two weeks later, Norville and Mason met again and discussed fertilizer for the farms and what grain was to be planted by Norville. Sometime in July or August 1960, Norville and Mason had a conversation in the office of Joe Simpkins in Kincaid, Illinois. Norville said he had heard rumors that Mason was not going to rent the farm to him for the next year and he asked Mason about the rumors and Mason told him that was correct and that he would not get to farm the land for the next year. Prior to this time, sometime before May 1960, Norville had written to Mildred Eby, sending her checks received from corn harvested in 1959 and wheat sowed in 1959 and harvested in 1960. Mrs. Eby wrote him May 12, 1960, acknowledging receipt of the checks and asking about a bill from Midland Grain Company. In that letter Mrs. Eby said: "There some more taxes to be paid and the estate isn't closed. The doctor is a friend of Simpkins. All I know his name is Dr. Berman. I don't know his address yet. I haven't signed any papers since we're having trouble closing the estate." During this correspondence with Mrs. Eby, Norville admits that he knew the reference in Mrs. Eby's letter to Simpkins and Berman was in connection with the sale of the farm. He also admitted that while the correspondence between him and Mrs. Eby was going on, he had agreed with Glenwood Mason as to sowing crops of corn and beans and had sowed the crops as agreed upon; that

he had bought fertilizer in accordance with the agreement with Mason and had not consulted with Mrs. Eby about any acreage for any crops or about the fertilizer. In the correspondence, Norville did not question the authority of Mason to give him orders concerning the farm, and admitted that he knew Mason was not acting for Mrs. Eby. He claimed he did not know who Mason was acting for, but figured Mason had some reason to "jump in." Following the conversation with Mason at which time Mason told Norville he could not have the farm for the coming year, Norville went to Stuart Traynor and told him Mason had fired him. Norville claims Traynor told him he was going to get some information on that and that later he told him that Mason did not have any business firing him. Traynor testified that when Norville told him Mason had fired him, he was not certain whether Norville was being put off the farm then, or if it meant the subsequent year. This was in July of 1960. He talked with Mr. Simpkins and Simpkins told him he had not directed Mason to fire Norville off the farm then and there.

Stuart J. Traynor, lawyer for the Collins estate and one of the trustees under the will testified that the land was sold to Lillian Schneider but the deed had never been delivered but that the sale terms had been agreed upon and the deed was ready for delivery. This witness testified that he had told Norville numerous times the farms were being sold, the first time in 1959. That at that time Norville attempted to make arrangements to buy the farms himself. That Norville was consulting him regularly about the sale and the problems he, as tenant, was confronted with. That Norville talked to him about the position and authority of Glenwood Mason. When Norville told him in July 1960 that Mason had fired him that he told him that he assumed that was by direction of the pur-

chaser. He further testified that Norville came into his office frequently to inquire about what Norville's final status ,was going to be and as to whether he was going to be the tenant for another year. That by the terms of the sale agreement the new purchaser was to get the 1960 crops.

Glenwood Mason testified that he was asked by Joe Simpkins to take charge of the farms for him. He called Norville and had him come to Mason's office in Kincaid, Illinois. He informed Norville he was the manager of the farms and wanted to make an agreement with Norville as to the tenancy, if they could come to terms. That they discussed the rotation of crops, the use of fertilizer and the division of the crops, and like matters. That the normal practice for a farm year is from March 1st to March 1st, which would end the tenancy of Norville March 1, 1961. That Norville agreed to the term. That afterwards, they discussed the fertilizer dressing for the wheat crop, planting of corn on some pasture land and entering the farm program. That he collected the landlord's share of the wheat crop and sent it to Lillian Schneider. That the landlord's share of corn harvested in 1960 was stored in an elevator by Norville at Mason's direction. He further testified that in July Norville told him that if he could not have the farms he wanted to know because he wanted to look for another farm. That he at that time told Norville he would not have the farm for another year. Later, when Norville was harvesting beans, that he, Mason, in company with one Bill Dickey talked to Norville out in the bean field. That he told Norville to store the landlord's share of the beans, and about a week later he had Dickey sow about 36 acres of wheat where the beans had been. That at his request, Norville took the seed wheat to the elevator, had it cleaned and brought it back and afterwards charged Mason for the seed cleaning.

216

That he leased the farm to Lawrence Dambacher in December 1960. This witness stated that the oral lease with Norville for both the pasture lands and the other farm lands was to expire March 1, 1961. That in October 1960, Norville submitted a claim for $190.50 for unused part of commercial fertilizer bought to be used on the farms.

Joe Simpkins confirmed the authority of Mason to manage the farms and the purchase of the lands. He testified that he had told Mason in January or February 1960 to lease the farm for one year only. That he was called on the telephone by Norville and he advised Norville that he would not get to farm the lands the next year. He admitted the farms were bought in the name of Lillian Schneider who worked in his office, but the actual purchasers were himself and Dr. Berman.

Lawrence Dambacher testified he agreed with Mason to lease the farm. He saw Norville in January or February 1961 and told Norville he had been promised a lease of the farms and was going to move a man in. At that time Norville said he was going to try and keep the farm if he could. In March 1961 he plowed 110 of the 120 acres of the Sicily farm and 124 acres of the Jeiseyville farm. That he plowed 40 acres the first day and Norville called on him the next day and thanked him for plowing the 40 acres for him and stated he was going to stay on the farm. Sometime before the 1st of March 1961, he talked with Norville at the Jeiseyville farm and was going to clean up the place and Norville asked permission to keep some hogs there till on or after March 1st, and that he agreed to let him keep the hogs there to March 1st, 1961.

Norville in rebuttal testified that he talked with Dambacher about the hogs, that he told Dambacher the law was in his favor, that he was going to hold

217

possession of the farms, and regardless of how it came out, would Dambacher let him keep the hogs there until he got them fattened, and that Dambacher agreed.

The court held that the plaintiff Anthony Norville was a tenant of the 160 acres tract except 20 acres of pasture land, and of the 120 acres tract, except 10 acres of pasture, for a period beginning March 1, 1961 to March 1, 1962 and that Anthony Norville was not entitled to possession of the 20 acres of pasture land excepted from the 160 acre tract and the 10 acres of pasture land excepted from the 120 acres tract. Decree in accordance with these findings was entered. The defendants appeal to this court.

■ The sole question involved is whether Anthony Norville was a tenant from year to year, or a tenant for a specified term ending March 1st, 1961. If he was a tenant from year to year, under the law then in effect, he was entitled to written notice of the termination of his tenancy at least 60 days prior to the expiration of the yearly term. If he was a tenant for a specified term he was not entitled to notice, since his tenancy expired at the end of the lease term.

In this case the plaintiff became a tenant under a written lease from Mildred Eby for a term from March 1, 1958 to March 1, 1959. He remained as a tenant under the same terms and conditions for the term from March 1, 1959 to March 1, 1960. His tenancy for this second year was a tenancy from year to year. Had he remained a tenant under the same terms and conditions for the term from March 1, 1960 to March 1, 1961, he would still remain a tenant from year to year. However, before the term from March 1, 1959 to March 1, 1960 had expired, he was informed that the farms had been sold or were in the process of being sold and one Glenwood Mason took charge as overseer of the farms. Thereafter and before the farm

year ending March 1, 1960 had expired, he entered into an oral agreement with Mason to farm the same land except the new agreement included the pasture lands and buildings. Norville denies that there was any agreement as to a specified term. The testimony of Glenwood Mason and Stuart Traynor controverts his evidence on this point. Both these witnesses stated that Norville was told he could have the farms for the coming crop year. Traynor testified he told Norville in January or February 1960, in a discussion of leasing the farm for the following crop year, the farms had been sold but that he would be the tenant for the year 1960 and that he would have to look to the new owner for anything after 1960. Glenwood Mason testified that he talked with Norville in February 1960 and told him if they could reach an agreement he was authorized to extend to him a one year lease ending March 1, 1961, and that Norville said that was agreeable. After agreement on the tenancy, they discussed crop rotation, fertilizer, that they would not feed livestock, and other matters. In further substantiation of the defendants' contention that Norville held the farms for a one year term by agreement with Mason, there is evidence of orders from Mason and compliance by Norville as to crops raised, the use of fertilizer, the disposition of crops raised, and other matters concerning the tenancy. There is nothing in the record to show that Norville at any time after the February meeting between himself and Mason ever questioned Mason's authority as overseer of the farms. The fact that he did not know who the farm had been sold to, is immaterial.

The case of Madlung et al. v. Jackson, 172 Ill App 60, holds that where a tenant holds possession of the premises after the expiration of the lease for a year or years under which he went into possession, a presumption obtains that he continues to hold the

premises under said lease, and the law by implication creates a new tenancy from year to year. Such presumption, however, is not conclusive, but is rebuttable by proof that the tenant holds over under a new agreement with the landlord, even though such agreement is unenforceable and void under the statute of frauds.

Defendant cites the case of Johnson v. Foreman, 40 Ill App 456. The court in that case held a tenancy from year to year will not be created against the contrary intention of both parties, landlord as well as tenant. Here, the evidence as to the acts of both the tenant and the overseer of the landlord, show that they intended that the term be for one year ending March 1, 1961. There is nothing to show any contrary intention on the part of the tenant until the time had passed for the giving of the 60 days notice and he either learned or became aware that if he was a tenant from year to year he was entitled to the 60 days notice. His statements to Mason and to Traynor, after he learned he was not going to have the farms for the next year indicate his acceptance of the fact that he was operating under a one year term. His failure to object to the planting of wheat land by Dickey on one of the farms he claimed to hold as a tenant indicates he recognized his term was to expire in March 1961. His allowing Dambacher to plow the lands is another indication.

The case of Secor v. Pestane, 37 Ill 525, almost a hundred years ago announced the doctrine that one who continued in possession under a verbal lease was a tenant for years and not a tenant from year to year, and that the tenancy being for a fixed term, no notice to quit was necessary.

The plaintiff cites the case of Barbee v. Evans, 220 Ill App 154. In that case the court, citing the case of Johnson v. Foreman, 40 Ill App 456, said: "A

220

tenancy from year to year will be created where a tenant holds over, after the expiration of a former lease, for one or more years, and pays rent, *nothing being said between the parties, no agreement as to the time he shall hold being made."* (The emphasis is ours.) Here there was a new agreement made. And in the case of Bell v. Groom, 224 Ill App 58, cited by plaintiff, it was also held that a tenant under a written lease for a year or years, who holds over without any further agreement or understanding, becomes a tenant from year to year. Here, there was a further agreement or understanding.

It is the opinion of this court that the evidence clearly shows that a new agreement for the year from March 1, 1960 to March 1, 1961, was entered into by the tenant and Mason; that although the tenant now denies there was a definite term, his actions as shown by the evidence, represent an acknowledgment on his part of the new agreement and that by entering into and becoming a part of the new agreement he is now estopped to claim tenancy from year to year. We must further hold, that by having entered into the new agreement for a definite term ending March 1, 1961, he was not entitled to notice under the statute, and that any holding over by him after March 1, 1961 was illegal.

For the reasons stated, the decree will be reversed, and the cause remanded with instructions to enter a decree in accordance with the views expressed herein.

Reversed and cause remanded with instructions.

ROETH, P. J. and CARROLL, J., concur.